1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9   CLIFFORD SWORTFIGUER,                    CASE NO. 1:10-cv-01835-BAM

10                          Plaintiff,
                                            ORDER AFFIRMING DENIAL OF
11        v.                                BENEFITS AND ORDERING
                                            JUDGMENT FOR COMMISSIONER
12   MICHAEL J. ASTRUE,
     Commissioner of Social Security,
13
                           Defendant.
14   _____/

15
16        Plaintiff Clifford Swortfiguer, by his attorneys, Law Office of Bess Brewer & Associates,

17   seeks judicial review of a final decision of the Commissioner of Social Security

18   ("Commissioner") denying his application for disability insurance benefits (DIB) under Title II of

19   the Social Security Act and for supplemental security income  ("SSI") pursuant to Title XVI of

20   the Social Security Act (42 U.S.C. § 301 *et seq.)* (the "Act").  The matter is currently before the

21   Court on the parties' cross-briefs, which were submitted, without oral argument, to the

22   Honorable Barbara A. McAuliffe, United States Magistrate Judge.  Following a review of the

23   complete record and applicable law, this Court affirms the agency's determination to deny

24   benefits to Plaintiff.

25   **I.    Administrative Record**

26        **A.    Procedural History**

27        Plaintiff was insured under the Act through September 30, 2012.  On April 17, 2008,

28   Plaintiff applied for disability insurance benefits pursuant to Title II; on April 22, 2008, Plaintiff

1  applied for supplemental security income ("SSI") under Title XVI.  He alleged disability

2  beginning February 27, 2008.  His claims were initially denied on June 20, 2008, and upon

3  reconsideration, on October 1, 2008.  On November 5, 2005, Plaintiff filed a timely request for a

4  hearing.  Plaintiff appeared and testified at a hearing on January 13, 2010.  On February 26, 2010,

5  Administrative Law Judge Timothy S. Snelling denied Plaintiff's applications.  The Appeals

6  Council denied review on July 1, 2010.  On October 1, 2010, Plaintiff filed a complaint seeking

7  this Court's review.

8       **B.**   **Administrative Record**

9       **Plaintiff's testimony.**  Plaintiff (born March 15, 1961) completed the eleventh grade and

10  obtained a GED.  He had previously worked in construction and as a local and long-haul trucker.

11  Although he had sometimes worked part-time jobs, he testified that he had not worked since April

12  17, 2006, despite numerous job applications.  Plaintiff explained that he could no longer pass the

13  test required for Class A drivers, which required prospective drivers to demonstrate their ability to

14  climb stairs and to lift weights over their heads.  In addition, he was unable to remain seated for

15  long hours, as is required for a driver or a passenger, and was constantly too tired to drive safely.

16       Plaintiff's heart problems began as child with a congenital heart defect that was surgically

17  repaired when he was seven.  At about age fourteen, he was diagnosed with lymphoma, which

18  was treated with radiation therapy.  In 1996, at the age of 34, he underwent quadruple bypass

19  surgery.  Thereafter, he developed congestive heart failure.  Plaintiff also experienced recurrent

20  problems with his left leg, from which blood vessels were harvested for the bypass, including

21  recurrent staph infections and cellulitis.  He had frequent chest pains, which he initially treated

22  with nitroglycerine, but for which he sought emergency room treatment if the pain was not

23  reduced after two doses of nitroglycerine.

24       Over recent years, Plaintiff's health and stamina have declined.  Plaintiff testified that as a

25  result of his heart condition, he experienced shortness of breath and fatigue.  His legs swelled

26  faster than Lasix, a diuretic, could eliminate the fluid.  He needed to elevate his legs at least one-

27  to-two hours a day and could not sit without moving for more than an one and a half to two hours.

28  ///

He also experienced headaches and disturbances of vision which his physicians attributed to side effects of his medications.  His shoulder was too painful to lift anything over his head.  Plaintiff stopped working after his gall bladder was removed in 2008.

Plaintiff lived with five of his nine children.  He rose at 6:30 or 7:00 a.m. to take his sons to school.  In the course of the day, he took two one-hour naps, although on bad days, he could nap for three or four hours. He chauffeured the children, attended his sons' sporting events, shopped for groceries, ran other errands, and washed dishes. He retired between 8:30 and 10:00 p.m., but slept poorly; he frequently woke, gasping for air.

**Exertion Questionnaire.**  On April 30, 2008, Plaintiff completed an exertion questionnaire of a form apparently prepared by counsel.  He was then living in a 37-foot travel trailer with three sons aged 14, 12, and 10.  On a typical day, he awoke, showered, dressed, prepared school lunches, and drove his sons to school.  He would complete any errands, then return home to rest and read until picking the boys up at the end of the school day, supervising their homework, and reading with them.  He shared responsibility for preparing supper with his sons.  Plaintiff shopped for groceries once a week, accompanied by a son to lift for him.  He no longer worked on cars or did yard work.  He slept eight hours daily.

Plaintiff reported that when he exerted himself physically, he immediately began to experience shortness of breath and chest discomfort, followed by weakness, fatigue, and severe migraine headaches.  He could walk about 100 feet before needing to rest for one to two minutes. He did not lift more than ten pounds.

Plaintiff's medications included Lipitor, Tricor, Lasix, Amiodarone, Coreg, Potassium, and Benazepril HCl.

**Medical records.**  On June 26, 2006, John B. Krpan, M.D., treated Plaintiff for an upper gastrointestinal bleed in the emergency room of Mark Twain St. Joseph Hospital.  On September 25, 2006, Dr. Krpan treated Plaintiff in the emergency room for cellulitis.  Plaintiff complained of chest pain and palpitations.  Dr. Krpan noted his rapid heart rate.

On January 3, 2007, Joydev Acharya, M.D., conducted an invasive evaluation of Plaintiff's coronary arteries and bypasses, including left heart catheterization, right and left

coronary angiography, left ventriculography, saphenous vein graft angiography, left internal mammary artery angiography, and right heart catheterization.  Following testing, Dr. Acharya noted severe native vessel disease; left ventricular dysfunction with an ejection fraction of 40%; no residual pulmonic stenosis; no evidence of intercardiac shunts, and no evidence of constricted physiology.  Although only three of the four grafts were patent, Dr. Acharya opined that Plaintiff was then adequately revascularized.

Plaintiff first saw primary care doctor Ryan S. Thompson, M.D., on April 6, 2007, apparently for treatment of an open wound on his right leg.  On May 7, 2007, Dr. Thompson treated Plaintiff for a cough with no shortness of breath.  On May 21, 2007, Plaintiff's cough was better.  Dr. Thompson noted that Plaintiff's blood count was normal, his blood sugar was slightly elevated (115), triglycerides were high (415), and HDL was 30, putting him at increased risk of recurrent disease.

On September 10, 2007, Plaintiff told Dr. Thompson of recent episodes in which he had felt stunned for 5 to 10 seconds while at rest.  Dr. Thompson recommended a Holter monitor to rule out arrythmia.

On February 27, 2008, Dr. Thompson noted Plaintiff's shortness of breath and labored breathing had increased in the past three to four weeks.  Although Plaintiff had increased his Lasix dosage, he had 1-2+ pitting edema.  Because Plaintiff had run out of insurance benefits, he had run out of Lipitor and Tricor.  Dr. Thompson noted that the EKG revealed atrial flutter with a 3 to 1 block and, following consultation with Plaintiff's cardiologist, prescribed coumadin.

Cardiologist Rajesh K. Dubey, M.D., examined Plaintiff on March 3, 2008, and confirmed the diagnosis of atrial flutter.  Plaintiff complained of worsening shortness of breath.  Dr. Dubey opined that if Plaintiff's symptoms worsened, he would need elective cardioversion to resolve the atrial flutter.

On March 6, 2008, Plaintiff was treated for chest pain in the emergency room.

///

///

///

1    On March 8, 2008, Plaintiff received emergency room treatment for poison oak.  On

2 March 9, 2008, Plaintiff received stitches to a leg wound[1] incurred while trying to clear brush

3 while riding a dirt bike.

4    On March 14, 2008, Dr. Thompson noted that Plaintiff looked ill, tired, and exhausted.

5 He was experiencing orthopnea (inability to breath when lying down) with associated jaw and

6 neck pain.  Plaintiff was also experiencing severe shortness of breath on exertion.  Because he had

7 no insurance, Plaintiff was unable to schedule an appointment with his cardiologist, Dr. Dubey.

8 After consultation with Dr. Dubey's office, Dr. Thompson sent Plaintiff to the emergency room.

9    Cardiologist Kent Wong, M.D., admitted Plaintiff to Doctors Medical Center from the

10 emergency room for severe shortness of breath.  Wong noted that Plaintiff had orthopnea and

11 paroxysmal nocturnal dyspnea.  He described Plaintiff's heart sounds, S1 and S2, as "irregularly

12 irregular."  AR 205.  His second pulmonic heart sound was loud with a 1/6 holosystolic murmur

13 at the left sternal border.  Edema was 1+.  Wong noted that Plaintiff was in mild congestive heart

14 failure, likely related to left ventricle dysfunction, exacerbated by atrial flutter and fibrillation.  He

15 ordered coumadin held, commenting that Plaintiff was over anticoagulated.  Plaintiff was first to

16 be diuresed with IV Lasix, with a Persantine-Cardiolite stress test to follow.  An x-ray indicated

17 that Plaintiff's heart was enlarged to the upper limits of normal.

18    On March 15, 2008, Dana Buchanan, O.D., reviewed Plaintiff's chest x-ray, noting

19 cardiomegaly and mild pulmonary edema, but no infiltrates or effusions.  His blood pressure had

20 decreased following application of nitroglycerine paste.  Buchanan transferred Plaintiff to the

21 telemetry floor to rule out a myocardial infarction and for administration of an echocardiogram in

22 the morning.

23    Cardiologist Hassan Hussain, M.D., administered the Persantine-Cardiolite stress test on

24 March 16, 2008.  Dr. Hussain concluded that the study appeared negative for ischemia pending

25 perfusion scan images for correlation.  Dr. Hussain also evaluated the echocardiogram, noting:

26    Normal left ventricular size with left contractility being moderately depressed.
     Ejection fraction is in the range of about 40%.  The study is technically very

27

28

_____

[1]  Reports of Plaintiff's wound are inconsistent about whether the left or right leg was wounded.

1  limited and the endocardium is not well visualized in all views.  Moderate mitral
2  and moderate tricuspid regurgitation is noted.  The right-sided pressures are
moderately elevated with suggestion of pulmonary hypertension.  There is no
3  significant aortic stenosis noted.  No evidence of any significant aortic
insufficiency noted.

4  AR 214.

5  Jocelyn I. Espiritu, M.D., evaluated the scans of the stress test.  She noted a small, fixed

6  defect in the anterior septal wall of the left ventricle; no evidence of ischemia; "paradoxical wall

7  motion in the septum with regional hypokinesis in the apex and  inferior wall"; and right

8  ventricular hypertrophy and dilatation.  The resting left ventricular ejection fraction was 39%.

9  Plaintiff was discharged from the hospital on March 17, 2008.  Dr. Dubey noted that

10  Plaintiff's symptoms had improved dramatically with aggressive IV diuresis.  The Persantine

11  nuclear test revealed a small septal defect in the anteroseptal wall, noticeable defect, and a

12  prominent right ventricle.  The left ventricular ejection fraction was 39%.  Plaintiff was to resume

13  coumadin on March 18 and be checked on March 20, 2008.

14  On April 4, 2008, Plaintiff underwent a TEE-guided cardioversion to convert the atrial

15  flutter to a normal sinus rhythm.  Although the procedure was successful, Plaintiff still

16  experienced shortness of breath.  That night, Plaintiff returned to the emergency room with severe

17  dyspnea.

18  On April 5, 2008, Plaintiff was admitted to the hospital with increased shortness of breath,

19  and chest and abdominal pain.  Cardiac catheterization yielded no significant findings.  After

20  Plaintiff demonstrated increasing leukocytosis, an ultrasound revealed cholecystitis and

21  cholelithiasis.  After administering antibiotics, doctors removed Plaintiff's gall bladder on April 8,

22  2008.  Plaintiff remained in the hospital through April 11, 2008.

23  Dr. Wong evaluated Plaintiff's echocardiogram on May 20, 2008.  He found preserved left

24  ventricular systolic function, paradoxical motion of the septum, and mild mitral and tricuspid

25  regurgitation.

26  ///
27  ///
28  ///

6

When Plaintiff saw Dr. Wong on June 3, 2008, he was slowly resuming normal activities. He denied excessive weight gain or shortness of breath.[2]  Dr. Wong noted:

> The patient used to be a logger by profession.  The patient does not feel he is able to return to the same type of work, because of physical demands.  The patient continues to be on disability, and apparently he has to stay on disability until March of 2009 in order for him to obtain benefits.

AR 330.

Dr. Wong summarized the examination:

> Underlying coronary artery disease, New York Heart Association functional class IIB.  Recent echocardiogram after TEE-cardioversion showed improvement in the ejection fraction to about 45 to 50%.  On today's visit, I have recommended the patient to continue with the same medications.  The patient has been reiterated in regards to the importance of compliance to a low-sodium diet and weight monitoring.  The patient's temporary disability will be extended to March of 2009, which should allow him ample time to recover from the congestive heart failure, and to seek alternatives for his job.  The patient otherwise can return to my office in six months for a checkup.

AR 331.[3]

On June 6, 2008, nurse practitioner Lisa Adams completed a medical source statement on a form apparently prepared by Plaintiff's attorney.  Ms. Adams opined that Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently; could stand or walk at least two hours in an eight-hour work day; could sit six hours in an eight-hour work day; could balance constantly, stoop and kneel occasionally, but never climb, crouch or crawl;  could occasionally reach and handle, and could constantly finger or feel.  She added that Plaintiff had no symptoms at rest but could not sustain a moderate-heavy level of activity or lifting.  He would need frequent rests.  Plaintiff would be restricted from heights, moving machinery, temperature extremes,

///

---

[2]  In a patient with congestive heart failure, excessive weight gain may signify excessive fluid retention.

[3]  The New York Heart Association (NYHA) established a functional classification system for the stages of heart failure based on the extent to which the patient is limited during physical activity.  According to the American Heart Association, the Class II (Mild) category includes patients with light limitation of physical activity. They are comfortable at rest, but ordinary physical activity results in fatigue, palpitation, or dyspnea.  Class B includes objective evidence of minimal cardiovascular disease including mild symptoms and slight limitation during ordinary activity, with the patient comfortable at rest.
http://www.heart.org/HEARTORG/Conditions/HeartFailure/AboutHeartFailure/Classes-of-Heart-Failure_UCM_306328_Article.jspUCM (August 7, 2012).

1    chemicals, and dust. Ms. Adams based her opinions on Plaintiff's IIB classification on the New

2    York Heart Association scale and his ejection fraction of 35%.

3          On June 13, 2008, agency physician James V. Glaser, M.D., assessed Plaintiff's residual

4    functional capacity. Glaser opined that Plaintiff could lift twenty pounds occasionally and ten

5    pounds frequently; could stand or walk at least two hours in an eight-hour workday; and could sit

6    about six hours in an eight-hour workday. Glaser added that Plaintiff's condition should continue

7    to improve so that his assessment would no longer apply by February 2009. In his accompanying

8    case analysis, Dr. Glaser noted improvement in Plaintiff's May 2008 echocardiogram indicated

9    that he would continue to improve and opined that Plaintiff would be capable of performing

10   sedentary work by February 2009.

11         On July 17, 2008, Plaintiff saw Dr. Thompson and complained of shooting pain in his

12   shoulder. Plaintiff had full range of motion in his shoulder, although he experienced discomfort

13   when he raised his arm above 90 degrees. Dr. Thompson suspected a possible rotator cuff injury.

14         On August 11, 2008, Dr. Wong completed a cardiac residual functional capacity

15   questionnaire on a form apparently provided by Plaintiff's attorney. Dr. Wong stated that

16   Plaintiff's sole symptom was shortness of breath, which markedly limited his physical activity.

17   His condition could be expected to frequently interfere with attention and concentration. Plaintiff

18   could walk less than a block without requiring rest or experiencing severe pain. He could sit at

19   least six hours in an eight-hour work day, but could stand or walk less than two hours in an eight-

20   hour work day. He needed to be able to change position or rest at will. With prolonged sitting,

21   Plaintiff's legs should be elevated at least 20 degrees for 20 percent of the time. Plaintiff could

22   rarely lift ten pounds and occasionally lift less than ten pounds. He could occasionally twist,

23   rarely stoop, crouch or squat, and never climb ladders or stairs. Moderate stress was permissible.

24   Plaintiff should avoid all exposure to extreme heat or cold, high humidity or wetness, cigarette

25   smoke, perfumes, soldering fluxes, solvents/cleaners, fumes, odors, gases, dust, and chemicals.

26   Plaintiff's symptoms began March 3, 2008, and could be expected to last at least twelve months.

27   Plaintiff could be expected to experience good and bad days, and was likely to miss work about

28   four days monthly as a result of his impairments or treatment.

1   On August 15, 2008, Plaintiff saw Marc Walter, M.D., in the emergency room of Mark

2   Twain St. Joseph Hospital and described himself as feeling "cruddy," with shortness of breath,

3   fever, chills, back and neck pain, and nausea and vomiting.  Gabriel Pettersen assessed Plaintiff's

4   abnormal echocardiogram as suggesting left atrial enlargement, past transmural ischemia, and first

5   degree heart block.  Diagnosing Plaintiff with general malaise, Dr. Walter instructed Plaintiff to

6   continue with cardiac rehabilitation and to see Dr. Thompson if he continued to feel ill.

7   On September 26, 2008, agency physician I. Ocrant, M.D., prepared a case analysis in

8   light of Plaintiff's complaints of constant fatigue.  Dr. Ocrant affirmed the June 13, 2008 case

9   analysis as written.

10   At an office visit with Dr. Wong on December 9, 2008, Plaintiff denied symptoms of

11   shortness of breath and reported exercising at cardiac rehab.  He had experienced a rare instance

12   of chest tightness that was not bad enough to require his taking nitroglycerine.  His ejection

13   fraction had improved from 35% to 45-50%.

14   At a June 15, 2009 appointment with Dr. Wong, Plaintiff again denied chest pain or

15   shortness of breath.  His May 2009 echocardiogram showed an ejection fraction of 50%.  Plaintiff

16   had returned to work, but reported that the physical intensity of his job made him tired after work.

17   Wong wrote, "[T]here are no signs of angina or congestive heart failure, and the limitation as to

18   what his activity level should be will simply be a matter of how much his body can tolerate."  AR

19   428.

20   **II.   Legal Standards**

21   To qualify for benefits, a claimant must establish that he or she is unable to engage in

22   substantial gainful activity because of a medically determinable physical or mental impairment

23   which has lasted or can be expected to last for a continuous period of not less than twelve months.

24   42 U.S.C. § 1382c (a)(3)(A).  A claimant must demonstrate a physical or mental impairment of

25   such severity that he or she is not only unable to do his or her previous work, but cannot,

26   considering age, education, and work experience, engage in any other substantial gainful work

27   existing in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

28   ///

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability.  20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f).  The process requires consideration of the following questions:

| | |
|---|---|
| Step one: | Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two. |
| Step two: | Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate. |
| Step three: | Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four. |
| Step four: | Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five. |
| Step five: | Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled. |

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

The ALJ found that Plaintiff had engaged in substantial gainful activity since the amended alleged onset date of April 17, 2007, but resolved Plaintiff's application on other grounds. Plaintiff's severe impairments were coronary artery disease status post 4 coronary artery bypass grafts, congestive heart failure, and left ventricular dysfunction.  None of these impairments met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, App. 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).  Plaintiff had the residual functional ability to lift and carry 10 pounds occasionally and less than ten pounds frequently; to stand, and walk in combination two hours in an eight-hour work day; and to sit up to six hours in an eight-hour day.  Plaintiff was unable to perform any past relevant work.  Using the medical-vocational guidelines, Judge Snelling concluded that jobs that Plaintiff could perform existed in significant numbers in the national economy.  Accordingly, the ALJ concluded that Plaintiff was not disabled under the Act.

///

1    **III.    Scope of Review**

2         Congress has provided a limited scope of judicial review of the Commissioner's decision

3    to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

4    a court must determine whether substantial evidence supports the Commissioner's decision.  42

5    U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*,

6    402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d

7    1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept

8    as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must

9    be considered, weighing both the evidence that supports and the evidence that detracts from the

10   Commissioner's decision.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the

11   evidence and making findings, the Commissioner must apply the proper legal standards.  *See, e.g.,*

12   *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the ALJ's

13   determination that the claimant is not disabled if the ALJ applied the proper legal standards, and if

14   the ALJ's findings are supported by substantial evidence.  *See Sanchez v. Secretary of Health and*

15   *Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).  "Where the evidence as a whole can support

16   either outcome, we may not substitute our judgment for the ALJ's."  *Key v. Heckler*, 754 F.2d

17   1545, 1549 (9th Cir. 1985).

18   **IV.    Plaintiff's Credibility**

19        Plaintiff contends that the ALJ erred in finding Plaintiff not credible.

20        An ALJ is not "required to believe every allegation of disabling pain" or other non-

21   exertional requirement.  *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), *quoting Fair v. Bowen*,

22   885 F.2d 597, 603 (9th Cir. 1989).  But if he or she decides to reject a claimant's testimony after a

23   medical impairment has been established, the ALJ must make specific findings assessing the

24   credibility of the claimant's subjective complaints.  *Ceguerra v. Secretary of Health and Human*

25   *Services*, 933 F.2d 735, 738 (9th Cir. 1991).  *See also Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th

26   Cir. 1991).  "[T]he ALJ must identify what testimony is not credible and what evidence

27   undermines the claimant's complaints."  *Lester*, 81 F.3d at 834, *quoting Varney v. Secretary of*

28   *Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988).  He or she must set forth specific

11

reasons for rejecting the claim, explaining why the testimony is unpersuasive.  *Orn*, 495 F.3d at 635.  *See also Robbins v. Social Security Administration*, 466 F.3d 880, 885 (9th Cir. 2006).  The credibility findings must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony."  *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

When weighing a claimant's credibility, the ALJ may consider the claimant's reputation for truthfulness, inconsistencies in claimant's testimony or between her testimony and conduct, claimant's daily activities, claimant's work record, and testimony from physicians and third parties about the nature, severity and effect of claimant's claimed symptoms.  *Light v. Social Security Administration*, 119 F.3d 789, 792 (9th Cir. 1997).  The ALJ may consider "(1) ordinary techniques of credibility evaluation, such as claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities."  *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008), *quoting Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996).  If the ALJ's finding is supported by substantial evidence, the Court may not second-guess his or her decision.  *Thomas*, 278 F.3d at 959.

The Ninth Circuit has summarized the applicable standard:

> [T]o discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide "'specific cogent reasons for the disbelief.'" *Morgan*, 169 F.3d [595,] 599 [9[th] Cir. 1999] (quoting *Lester*, 81 F.3d at 834).  The ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive." *Id.* Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the claimant's testimony must be clear and convincing." *Id.* Social Security Administration rulings specify the proper bases for rejection of a claimant's testimony . . . An ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the agency's rules. *See* 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, . . . and are to be relied upon as precedent in adjudicating cases."); *see also Daniels v. Apfel*, 154 F.3d 1129, 1131 (10th Cir. 1998) (concluding the ALJ's decision at step three of the disability determination was contrary to agency rulings and therefore warranted remand). Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and "unexplained, or inadequately explained, failure to

seek treatment or follow a prescribed course of treatment." *Fair*, 885 F.2d at 603; *see also Thomas*, 278 F.3d at 958-59.

*Orn*, 495 F.3d at 635.

Judge Snelling found that Plaintiff's impairments could reasonably be considered to cause Plaintiff's alleged symptoms, but that Plaintiff's testimony about the intensity, persistence, and limiting effects of his symptoms were not fully credible.  In particular, the ALJ noted that Plaintiff had both continued to work and continued to engage in home maintenance activities requiring substantial exertion.

> In terms of the claimant's alleged coronary artery disease and congestive heart failure, the record shows steady improvement of the claimant's symptoms.  Indeed the record also shows that the claimant reported working, or engaging in physically demanding activities such as clearing brush, to his physicians on more than one occasion after the alleged onset date and that some, if not all of these reports are corroborated by corresponding earnings records.  Dr. Wong's notes in particular express concern about the [Plaintiff's] choice of work, but clearly convey the doctor's belief that the claimant can perform work that is not as exertionally demanding as [Plaintiff's] previous work.

AR 14.

As outlined in the preceding summary of the administrative record, Plaintiff experienced a three-to-four-month period of especially ill health in 2008.  The odyssey began in early March 2008, when Plaintiff was treated in the emergency room on three times in four consecutive days for chest pain, poison oak exposure, and a laceration incurred while clearing brush while riding a dirt bike.  From mid-March into May, Plaintiff experienced increased symptoms, particularly shortness of breath caused largely by atrial fibrillation, which was corrected by elective cardioversion on April 4, 2008.  Plaintiff then had his gall bladder removed on April 8, 2008.  By the time Plaintiff saw Dr. Wong at a follow-up appointment on June 3, 2008, however, Plaintiff denied excessive weight gain or shortness of breath.  Nonetheless, Dr. Wong continued Plaintiff on temporary disability to "allow him ample time to recover from the congestive heart failure and to seek alternatives for his job."  AR 331.

That Dr. Wong required no cardiac follow-up appointment for six months indicates that Plaintiff's period of acute illness had passed.  Agency physician Glaser agreed, noting that the ///

13

1  improvement apparent in Plaintiff's May 2008 echocardiogram established a pattern of
2  improvement that would allow Plaintiff to perform sedentary work by February 2009.

3      By August 2008, Plaintiff was participating in cardiac rehabilitation three times weekly.
4  His participation in cardiac rehabilitation continued at least until December 2008, when Plaintiff
5  again denied shortness of breath and told Dr. Wong of a rare instance of chest pain that was not so
6  bad as to require him to take nitroglycerine.

7      Plaintiff's improvement continued.  At the June 2009 appointment with Dr. Wong,
8  Plaintiff's ejection fraction had improved to 50%.  He again denied chest pain or shortness of
9  breath.  Although he was tired at the end of the day, Plaintiff had returned to work.  Wong noted
10 no signs of angina or congestive heart failure.

11     The ALJ also noted that Plaintiff's edema was well-controlled with medication.  No
12 physician opined that the edema affected Plaintiff's residual functional capacity.  Nor did any
13 medical records suggest that Plaintiff's headaches and shoulder pain were severe impairments
14 likely to persist fo twelve months or more.  Substantial evidence supported the ALJ's conclusion
15 that Plaintiff's testimony regarding his symptoms was less than credible.

16 **V.      Opinion of Dr. Wong, Plaintiff's Treating Physician**

17     Plaintiff contends that the ALJ erred in failing to adopt the opinions of Plaintiff's residual
18 functional capacity rendered by his treating physician, Dr. Wong, and that the ALJ accused Dr.
19 Wong of "lying."  The Commissioner counters that the ALJ accurately characterized Dr. Wong's
20 opinion as not solely motivated by medical concerns and appropriately considered the multiple,
21 similar medical opinions in reaching his conclusion that Plaintiff was capable of sedentary work.

22     Physicians render two types of opinions in disability cases: (1) medical, clinical opinions
23 regarding the nature of the claimant's impairments and (2) opinions on the claimant's ability to
24 perform work.  *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  An ALJ is "not bound
25 by an expert medical opinion on the ultimate question of disability."  *Tomasetti*, 533 F.3d at 1041;
26 S. S. R. 96-5p.  The regulations provide that medical opinions be evaluated by considering (1) the
27 examining relationship; (2) the treatment relationship, including (a) the length of the treatment
28 relationship or frequency of examination, and the (b) nature and extent of the treatment

relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors that support or contradict a medical opinion.  28 C.F.R. § 404.1527(d).

Three types of physicians may offer opinions in social security cases: "(1) those who treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the claimant (examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant (nonexamining physicians)." *Lester*, 81 F.3d at 830.  A treating physician's opinion is generally entitled to more weight than the opinion of a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a non-examining physician. *Id.*  The Social Security Administration favors the opinion of a treating physician over that of nontreating physicians.  20 C.F.R. § 404.1527; *Orn*, 495 F.3d at 631.  A treating physician is employed to cure and has a greater opportunity to know and observe the patient. *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9ᵗʰ Cir. 1987).  Nonetheless, a treating physician's opinion is not conclusive as to either a physical condition or the ultimate issue of disability. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9ᵗʰ Cir. 1989).

Judge Snelling gave Dr. Wong's opinion great weight but recognized that some limitation was required in light of Dr. Wong's acknowledgment of Plaintiff's need to be disabled for twelve or more months in order to draw disability assistance and of the inconsistency of some of his very restrictive opinions with his own treatment notes.  After reviewing the opinions of Dr. Wong, nurse Lisa Adams, and agency consultant Dr. Glaser, the ALJ explained:

> I give significant weight to all of the opinions as they are largely consistent with each other and the record as a whole.  The opinion of nurse practitioner Adams cannot be given the controlling weight to which a treating source would normally be entitled, because she is not an acceptable medical source within the meaning of 20 C.F.R. 404.1513(a) and 416.913(a).  I decline to give Dr. Wong's opinion controlling weight because it appears more restrictive than his own medical records warrant.  Moreover, the record demonstrates that Dr. Wong has previously certified the claimant as unable to work for other than medical reasons and it appears that overly restrictive limitations have been given here out of a similar sympathy for the claimant.  Finally, even though Dr. Glaser did not examine the claimant, his complete review of the medical records gives him a perspective on the claimant's conditions that was well supported with concrete examples.
>
> In making the above finding on residual functional capacity, the undersigned has given some weight to all functional capacity opinions of record, but controlling weight to none.  The claimant has been given the maximum reasonable benefit of the doubt.  In consideration of the claimant's continuing fatigue, the undersigned

assesses exertional limitations consistent with the recommendations . . . . in all the medical source statements.  But neither the objective medical evidence, nor the subjective allegations (to the extent they are reasonably credible), warrant any more restrictive functional limitations than those found in this case.

AR 15-16.

The ALJ appropriately denied Dr. Wong's opinion controlling weight based on the contrast between Dr. Wong's treatment notes, which documented improvement in Plaintiff's condition following cardioversion, the long (six month) intervals between follow-up appointments, and Dr. Wong's very restrictive opinion of Plaintiff's residual functional capacity. In light of the objective observations set forth Dr. Wong's own treatment notes, the restrictions that he applied to Plaintiff's ability to work were not supportable.  Judge Snelling appropriately considered the juxtaposition of Dr. Wong's observation that Plaintiff needed to remain disabled for twelve months to secure benefits and the doctor's declaring Plaintiff disabled for the requisite time period.

An ALJ is not required to accept the opinion of any physician, including a treating physician, if the opinion is brief, conclusory, and inadequately supported by clinical findings. *Thomas*, 278 F.3d at 957.  Judge Snelling's decision to discount Dr. Wong's restrictive opinion was supported by sound reasoning and substantial evidence.

## VI.    Necessity of Vocational Expert

Plaintiff contends that, because of his non-exertional limitations, the ALJ erred in applying the medical vocational guidelines (the "grids") rather than securing the testimony of a vocational expert.

If a claimant establishes a *prima facie* case of disability by demonstrating an inability to return to his or her former employment, the burden shifts to the Commissioner to prove that, with due regard to the claimant's age, education, and prior experience, the claimant can perform other work available in the national economy.  *Burkhart*, 856 F.2d at 1340.  The Commissioner meets his burden in one of two ways: (1) applying the medical-vocational guidelines or (2) receiving the testimony of a vocational expert.  *See Desrosiers v. Secretary of Health and Human Services*, 846 F.2d 573, 577-78 (9th Cir. 1988) (Pregerson, J., concurring).

1      The medical-vocational guidelines promote efficiency, permit the commissioner to

2  streamline the administrative process, and foster uniform treatment of claims. *Tackett v. Apfel*,

3  180 F.3d 1094, 1101 (9th Cir. 1999). An ALJ may apply the medical-vocational guidelines only

4  when the grids accurately and completely describe the claimant's abilities and limitations. *Jones*,

5  760 F.2d at 998. This is because the medical-vocational guidelines are based on strength factors

6  and may be inappropriate in cases involving non-exertional limitations. *Reddick*, 157 F.3d at 729

7  n. 11.

8      When a claimant's non-exertional limitations are so severe as to significantly limit the

9  range of work appropriate to the claimant's strength, the medical-vocational guidelines become

10  inapplicable. *Desrosiers*, 846 F.2d at 577.  In other words, if significant non-exertional factors

11  limit a claimant's ability to perform the full range of work at the applicable strength level

12  (sedentary, light, or medium), testimony of a vocational expert is needed to assess whether

13  sufficient work that the claimant can perform remains within that range. *Burkhart*, 856 F.2d at

14  1340.

15      Non-exertional limitations are those that do not directly affect the claimant's strength but

16  do affect his or her ability to perform one or more types of work within the strength range.

17  *Desrosiers*, 846 F.2d at 579.  They include mental, sensory, postural, manipulative, or

18  environmental limitations.  *Id.*  The mere existence of a non-exertional limitation does not

19  automatically require an ALJ to employ a vocational expert. *Tackett*, 180 F.3d at 1102.  To

20  preclude application of the medical-vocational guidelines, a non-exertional limitation must

21  significantly limit the range of work available to the claimant.  *Id.*

22      Plaintiff contends that his ability to perform work within the sedentary range was limited

23  by pain, fatigue, shortness of breath, a need to elevate his legs, and a need to rest frequently.  In

24  determining whether to apply the medical-vocational guidelines, Judge Snelling did not concur in

25  all of Plaintiff's claimed non-exertional limitations.

26      Taking into account Plaintiff's fatigue, Judge Snelling concluded that Plaintiff had the

27  residual functional capacity to perform the full range of sedentary work, that is, to lift and carry

28  ten pounds occasionally and less than ten pounds frequently; to stand and walk in combination for

two hours in an eight-hour work day; and to sit for up to six hours in an eight-hour work day.  His conclusion was consistent with Dr. Wong's most recent treatment notes (June 15, 2009), which reported that Plaintiff had returned to his former work but was tired at the end of the work day.  At that appointment, Plaintiff denied experiencing shortness of breath or chest pain.  Accordingly, as addressed in the discussion of Plaintiff's credibility *supra*, the ALJ did not err in dismissing Plaintiff's claims of pain, fatigue, and shortness of breath.

Similarly, as addressed in the discussion *supra* upholding the ALJ's determination not to fully credit Dr. Wong's excessively restrictive limitations, which were inconsistent and unsupportable, substantial evidence supported Judge Snelling's rejection of excessive limitations requiring Plaintiff to rest frequently and to elevate his legs for extended portions of the workday.

Having appropriately rejected the non-exertional limitations on which Plaintiff's argument relies, the ALJ did not err in concluding that Plaintiff could perform the full range of sedentary work.  Application of the medical-vocational guidelines was appropriate.

## VII.   <u>Conclusion and Order</u>

The ALJ's conclusions were supported by substantial credible evidence.  Accordingly, this Court hereby AFFIRMS the agency's determination to deny Plaintiff disability benefits.  The Clerk of Court is directed to enter judgment for Defendant Michael J. Astrue, Commissioner of Social Security.

IT IS SO ORDERED.

**Dated:**   __August 21, 2012__                _____/s/ **Barbara A. McAuliffe**_____
UNITED STATES MAGISTRATE JUDGE